IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 25, 2005

## JAMES L. MCCURRY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Roane County**
**No. 12057    E. Eugene Eblen, Judge**

––––––––––

**No. E2005-00350-CCA-R3-PC - Filed January 9, 2006**

––––––––––

The petitioner appeals the Roane County Criminal Court's denial of his petition for post-conviction relief from his conviction for first degree premeditated murder and resulting life sentence. He contends that he received the ineffective assistance of counsel because his trial attorney (1) failed to file a motion to suppress his statement to police; (2) failed to schedule a hearing to set bond; (3) failed to obtain a second psychological evaluation for him; and (4) failed to file a motion for change of venue. Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Jennifer E. Raby, Rockwood, Tennessee, for the appellant, James L. McCurry.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; J. Scott McCluen, District Attorney General; and Frank Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

This case arose from the petitioner's shooting his ex-wife, who had obtained an order of protection against him. A jury convicted the petitioner, and this court affirmed the conviction. See State v. James L. McCurry, No. E2001-01900-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 447 (Knoxville, May 20, 2002), perm. to appeal denied, (Tenn. 2002). On appeal, this court stated the following facts:

[O]n October 13, 1998, the Appellant awoke, dressed in a suit and tie

and drove 4 ½ hours from Taccoa, Georgia, to Kingston, Tennessee, where he entered the side door of the Re/Max Realty Company. At trial, the Appellant admitted that he wore a suit and carried a briefcase to conceal his pistol so he would not be noticed upon entering the building. As he entered the office, the victim and her co-worker, Peggy Giffin, were discussing a package the victim had just received by mail. The package contained cigarettes and a card signed by the Appellant. As the Appellant walked through the door of the office kitchen, he set his briefcase on the table. The Appellant removed the pistol from the briefcase and pointed it straight at the victim. In what Giffin described as a "cold, calm, [and] determined" manner, the Appellant shot the victim three times as the victim attempted to flee to her office. The autopsy report determined the cause of death to be a gunshot wound to the victim's right temple.

As two other employees were calling for emergency assistance, the Appellant walked back to the office kitchen, placed the gun in his briefcase, left the building, and drove approximately 1200 miles from Kingston to Memphis, Tennessee, then through Mississippi, Alabama, and back to Georgia. As he drove, the Appellant disposed of his briefcase and the murder weapon in different locations.

The Appellant surrendered to law enforcement officers in Georgia and was returned to Tennessee.

Id. at **3-5.

At the post-conviction evidentiary hearing, the petitioner testified that after the shooting, he turned himself in to Chip Angel, an attorney in Stephens County, Georgia, who had represented him in a bankruptcy case. Angel contacted the Stephens County police, who took the petitioner to the Stephens County Jail on the morning of October 14, 1998. Angel told the petitioner not to talk to the police without counsel present, and Angel told the Stephens County Police not to ask the petitioner any questions without the petitioner's attorney. That night, Kingston police officers arrived in Georgia to drive the petitioner back to Tennessee. During the drive, the petitioner told the officers that he did not want to give a statement. The petitioner testified that the officers tricked him into talking to them by telling him that the victim's son would want to know why he shot her. The petitioner was crying and upset and again told the officers that he did not want to speak to them. However, he finally talked to them about the shooting. The next day, the officers showed the petitioner his statement, which they had written out for him. They did not ask him to sign it. He said that the State introduced the statement into evidence at trial.

The petitioner testified that the trial court appointed an attorney to represent him and that he

met with his trial attorney soon after his arrest. They discussed the charge against him and possible sentences. The petitioner told his attorney that before the shooting, he had been depressed, unable to sleep, unable to eat, angry, and heard voices. However, he and his attorney never discussed any defenses. The petitioner told his attorney that he had given a statement to the police, but the attorney did not go over the statement with him and did not file a motion to suppress the statement. The petitioner did not have any prior convictions and told his attorney that he wanted to get out of jail. The attorney did not file a motion to set bond, and the petitioner stayed in jail until he went to trial. He said that if the trial court had set bond, he could have made bond with the assistance of family and friends. Upon his release from jail, the petitioner could have sought medical care, could have found witnesses to testify on his behalf, and could have hired an expert psychiatrist.

The petitioner testified that a Chattanooga doctor had prescribed Prozac for him but that he stopped taking the drug about one week before the shooting. The petitioner's attorney knew the petitioner had been taking Prozac for depression. In August 1999, ten months after the crime, the petitioner had a psychological evaluation. The petitioner was interviewed for one hour and did not take any psychological tests. The results of the evaluation showed the petitioner was competent to stand trial. The petitioner and his family talked with his attorney about getting a second psychological evaluation to determine if the petitioner was sane at the time of the crime, but the attorney did not think a second evaluation was necessary. The attorney never asked the petitioner about his childhood or if he had prior psychological problems. To the petitioner's knowledge, his attorney never contacted his Chattanooga physician. The petitioner and his attorney discussed the fact that stopping Prozac abruptly could provide him with a possible defense to the crime, but his attorney did not investigate possible defenses. He stated that his father had been physically and mentally abusive, that he had fallen out of a swing as a child and had been knocked unconscious, and that he suffered head injuries in a car accident in the 1960s. He stated that voices told him to kill the victim but that he did not drive to Kingston on October 13, 1998, with the intent to kill her.

The petitioner did not believe he could get a fair trial in Roane County because the victim had been a life-long citizen and because there was extensive publicity about the case. Eight potential jurors were dismissed from the jury pool because they stated they could not be fair. The petitioner talked with his attorney about seeking a change of venue, but his attorney never filed a motion. Approximately one week before trial, the petitioner's attorney talked with him about pleading guilty and receiving a twenty-five-year sentence. On the day the petitioner was suppose to plead guilty, his attorney learned that a life sentence was mandatory and that the petitioner would be required to serve the sentence at eighty-five percent. The petitioner decided he had nothing to lose by going to trial and decided not to plead guilty.

On cross-examination, the petitioner acknowledged that he and his attorney discussed suppressing his statement and that parts of the statement regarding the petitioner's drug and alcohol use could have been helpful to the defense. The petitioner also acknowledged signing a waiver of rights form in Stephens County, Georgia and that his trial attorney talked with attorney Chip Angel. He stated that two witnesses saw him walk into the victim's office and shoot her, but he said that if his statement had been suppressed, the jury would not have learned that he confessed to killing the

victim. He acknowledged that his defense at trial was that he was insane or suffered from diminished capacity at the time of the shooting, not that he did not shoot the victim. He acknowledged that he and his attorney talked about bond and that his attorney told him the amount would be high. He stated that his attorney did not tell him that the attorney had spoken to his family and that they had limited resources and limited willingness to hire another psychological expert. He admitted that he never told his attorney he heard voices or that his father abused him. He stated that he attended jury selection and that he did not request for any of the selected jurors to be excused. The petitioner acknowledged that the jurors swore they could decide his case fairly. On redirect examination, the petitioner testified that he did not want any parts of his statement introduced into evidence at trial and that his attorney discouraged him from seeking bond.

Dr. Kenneth Anchor, a clinical psychologist, testified that he evaluated the petitioner's mental condition and reviewed the trial transcript, the petitioner's medical records, and the petitioner's post-conviction petition. On November 6, 2003, Dr. Anchor interviewed the petitioner for five hours and gave the petitioner psychological tests. He stated that the petitioner was cooperative but seemed withdrawn, detached, and fatigued and that the petitioner complained of nightmares, alcohol abuse, and hearing voices. The petitioner told Dr. Anchor that he drank eight to ten beers the night before the shooting and that on the morning of the shooting, he drank more than one quart of coffee. The petitioner told Dr. Anchor that at the time of the shooting, he was "focused entirely upon doing what the voices were instructing him to do."

Dr. Anchor testified that the results of the petitioner's psychological tests revealed that the petitioner was "seriously impaired," had a schizoid type of personality, and had major depressive disorder. An intelligence test revealed that the petitioner was in the "low average range," consistent with someone having an eighth-grade education. Further testing revealed that the petitioner had illogical or irrational beliefs, "marked cognitive or mental impairment," psychotic thought processes, and marginal mental alertness. Dr. Anchor concluded that it was "somewhat doubtful" the petitioner had been competent to stand trial and stated that the petitioner may have met the criteria for an insanity defense. On cross-examination, Dr. Anchor testified that the petitioner's actions before the shooting reflected that he had planned parts of the crime. He acknowledged that his conclusions differed with the petitioner's prior evaluation and acknowledged that the prior evaluation was done closer to the date of the crime. However, he said that no psychological testing was conducted on the petitioner. He stated that he had previously testified in court, mainly for defendants, and that his fee in this case would be a few thousand dollars.

The petitioner's trial attorney testified that he met with the petitioner shortly after the petitioner's arrest and that his notes revealed the meeting lasted two and one-half hours. Counsel filed a motion to set bond but did not request a hearing on the motion. The petitioner's bond would have been at least one hundred thousand dollars, and the petitioner's chances of raising the ten thousand dollars needed in order to be released would have been "virtually nil." The petitioner indicated to counsel that getting out of jail was not that important to him because the petitioner wanted to "build time." The petitioner never told him that the petitioner would be able to find witnesses if he was released on bond.

Counsel testified that he discussed the petitioner's statement with him in detail. The petitioner had signed a waiver of rights form at 7:15 p.m. on October 14, 1998, in Stephens County, Georgia. Counsel talked with Chip Angel, and Angel never told him that the petitioner had invoked his right to counsel. The petitioner also did not tell his trial attorney that he had invoked his right to counsel. However, the petitioner told counsel that when he got to jail, he told officers that he did not want to speak with anyone. Counsel had no legal basis to attack the waiver of rights form and, therefore, did not file a motion to suppress the petitioner's statement. He said that some of what the petitioner said in the statement would have come out at trial anyway and that the defense wanted the jury to hear some of the statement to show that the petitioner suffered from diminished capacity.

Counsel testified that the petitioner had led him to believe that the petitioner was taking Prozac at the time of the shooting. However, when the petitioner testified at trial, he said that he had stopped taking the drug two or three days before the shooting and that he had not consumed any alcohol. The petitioner never told counsel that he had been abused by his father or that he heard voices. However, the petitioner was depressed, and counsel requested a psychological evaluation. According to the evaluation, the petitioner was competent and was not insane at the time of the crime. Counsel did not believe the trial court would allow a second evaluation, and counsel did not request one. Counsel could not find anyone to pay for a second, independent psychological evaluation. He stated that the petitioner did not seem to have any difficulty understanding the charge or potential sentences. The petitioner wrote down information about the crime and, other than a few misspellings, the petitioner's written sentences were coherent. He stated that the petitioner's case was not as highly publicized as some other murder trials, and he did not believe the trial court would grant a motion for change of venue. In the two years between the crime and the trial, there was no serious publicity about the case.

On cross-examination, counsel testified that he had been practicing law for about twenty-three years and that he met with the petitioner four or five times. He acknowledged that during the drive from Georgia to Tennessee, the petitioner was crying and upset. The petitioner told counsel that he did not read the waiver of rights form. Counsel stated that at least four potential jurors admitted they could not give the petitioner a fair trial but that he and the State were able to select a fair and impartial jury.

In a written order, the post-conviction court denied relief. According to the order, the petitioner's attorney worked diligently on his case, and the petitioner misled counsel regarding his use of drugs and alcohol before the crime. Regarding the petitioner's statement to police, the post-conviction court determined that counsel discussed the petitioner's options with him, that a motion to suppress probably would have failed, and that there were portions of the statement that counsel and the petitioner wanted before the jury. As to bond, the court found "no evidence with which to believe that the release of the defendant on bond pending trial would have affected the outcome of the trial in any way." Regarding a second psychological evaluation, the court concluded that the petitioner withheld information from his attorney about his mental condition, that there were no private funds available for a second evaluation, and that another evaluation would not have affected the outcome of the case. Finally, as to a change of venue, the post-conviction court held that a

5

request for change of venue would have been denied.

## II. Analysis

The petitioner claims that he received the ineffective assistance of counsel because his trial attorney (1) failed to file a motion to suppress his statement to police; (2) failed to schedule a hearing to set bond; (3) failed to obtain a second psychological evaluation for him; and (4) failed to file a motion for change of venue. The State claims that the petitioner did not receive the ineffective assistance of counsel. We agree with the State.

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id. "To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

Regarding the petitioner's claim that his attorney failed to file a motion to suppress his statement to police, the attorney testified that he discussed the statement with the petitioner and that they wanted the jury to hear parts of the statement. Thus, the attorney's not filing a motion to suppress was a tactical decision. The attorney also testified that he did not file a motion to suppress because the petitioner had signed a written waiver of rights form. Although the waiver of rights form is not in the record on appeal, the form was introduced into evidence at trial, and we take judicial notice of the record in the direct appeal of the petitioner's conviction. See State ex rel. Wilkerson v. Bomar, 213 Tenn. 499, 505, 376 S.W.2d 451, 453 (1964). The waiver of rights form shows that the petitioner signed it on October 14, 1998, in Stephens County, Georgia and that two Kingston,

Tennessee police officers witnessed the petitioner's signing the form. Sergeant Chris Woody of the Kingston Police Department testified at trial that he and two other officers drove the petitioner back to Kingston, and Sergeant Woody acknowledged that the petitioner was "talkative." The next day, Woody wrote down statements the petitioner had made during the trip. Our review of the petitioner's direct appeal record reveals that the State did not introduce Woody's written notes into evidence. However, Woody read from his notes some of the statements that the petitioner had made. He stated that the petitioner cried and seemed remorseful at times but acknowledged that the petitioner was able to speak clearly and communicate effectively. The petitioner's attorney testified that neither Chip Angel nor the petitioner told him that the petitioner had invoked his right to counsel. Thus, even if the petitioner's attorney had filed a motion to suppress, there is no evidence that the petitioner invoked his right to counsel or that the trial court would have granted the motion. The petitioner has failed to show that he received the ineffective assistance of counsel or that he was prejudiced by the attorney's not filing the motion.

As to the petitioner's claim that he received the ineffective assistance of counsel because his trial attorney failed to schedule a hearing to set bond, we agree with the post-conviction court that the petitioner has made no showing that his being on bond would have changed the outcome of his case. Regarding his attorney's failure to request a second psychological examination, the petitioner's attorney testified that the results of the first exam, which was conducted closer to the date of the crime than Dr. Anchor's exam, showed that the petitioner was sane and competent at the time of the crime. Moreover, Dr. Anchor did not testify at the post-conviction hearing that the petitioner was insane at the time of the crime or incompetent to stand trial, and the petitioner has failed to show that a second psychological evaluation would have changed the outcome of his case. Finally, as to the petitioner's claim that he received the ineffective assistance of counsel because his trial attorney failed to file a motion to change venue, the petitioner has presented no evidence to support his claim that excessive coverage in the media made him unable to receive a fair trial in Roane County. The petitioner has included the jury voir dire transcript in the appellate record. Our review of the transcript shows that nearly all of the potential jurors had heard about the petitioner's case through the media and that several stated they could not be fair. However, those potential jurors were dismissed from the jury pool, and the petitioner has presented no evidence that the remaining jurors were tainted by the publicity in his case.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE

7